28207.  NATIONAL ACCIDENT AND HEALTH INSURANCE COMPANY v. CHILDS.

634

*W. L. Bryan, Samuel H. Wilds, Carlton Mobley,* for plaintiff in error.

*W. E. Watkins, B. B. Garland,* contra.

FELTON, J. Marquis W. Childs sued National Accident & Health Insurance Company on a policy of accident insurance for an alleged total disability caused by accidental means.   The jury returned a verdict for the plaintiff and the company made a motion for new trial which was overruled.   Exception is taken to the order overruling the motion for new trial.   The questions presented by the record are: (1) Was the policy sued on void for the reason that the evidence showed that the plaintiff had a deformity before the date of the application, which was attached to the policy, when he stated in his application that he had no deformity? (2) Was the policy void for the reason that there was a false response as to whether the plaintiff had been disabled by a previous accident within ten years of the date of the application? (3) In the event the plaintiff should be entitled to recover is his recovery limited to $50 under the terms of the policy? (4) Is the plaintiff barred from a recovery on account of the particular accident involved in this case because of the fact that the policy had lapsed for nonpayment of premiums?

■   The provisions of the policy of insurance and the questions and answers in the application touching the first question raised by the record are: "In consideration of the initial payment of $7.60 and the statements and agreements in the application for this policy, a copy of which is indorsed hereon and made a part of this contract does insure.   .   .   This policy includes the indorsements and attached papers."   Copy of application.   13.   "Is your hearing or vision impaired and have you any infirmity, deformity or defect?   No."   15.   "Do you understand and agree that the right to recovery under any policy which may be issued upon the basis of this application shall be barred in the event that any of the foregoing statements, material either to the acceptance of the risk or

to the hazard assumed by the company, is false, or in the event that any one of the foregoing statements is false and made with the intent to deceive; that the insurance hereby applied for will not be in force until the delivery of the policy to you while you are in good health and free from all injury and that the company is not bound by any knowledge of or statements made by or to any agent unless written hereon? Yes."

On the trial of the case Dr. O. B. Howell testified that he had treated the insured; that he had examined x-rays taken of him and that they showed a misplacement of the fifth lumbar vertebra.

Dr. C. G. Boland testified that he examined the insured and the x-rays taken of him; that there were four x-rays taken, two from the anterior-posterior view and two from the side; that the views from the side show that the spine of the insured is normal; that the entire vertebral disks appear to be normal; that there is a slight discrepancy in one of the vertebræ, the fourth, in its relation to the fifth; that the lumbar process protrudes more to one side than the other; that there is a rather abnormal condition in the spine; that the lateral process of the fifth lumbar vertebra is closer to the hip bone on the left side than on the right, and in such a position that it appears as if it were impigned against or would strike the hip bone; that this so-called deformity is fairly unusual but is occasionally seen, and is frequently seen in persons who have no pain from the condition; that whether there is pain depends on whether the hip and the vertebra come into contact with each other; that otherwise the back of the insured is normal and shows no evidence of injury to the disks of the lateral processes; that the x-ray shows a congenital abnormal process to the left of the fifth lumbar vertebra; that this process causes an improper lever action, and a person having such a condition will be more susceptible to pain than one who does not have such a condition; that it would be possible for a man to have this condition and not know it until it was shown by x-ray; that should a falling bale of cotton hit a man on the shoulder it would have the effect of pushing his spine down to his hips, but the pushing down of the spine did not cause the condition here present.

Dr. K. S. Hunt testified in substance that he examined the x-rays made of the insured, and that they showed that the traverse process of the fifth lumbar vertebra was rather unusually long, and rested

against the crest of the ileum on the left side; that the pictures looked as if the natural growth brought the bones together; that an injury of the kind sustained by the insured might cause the production of pain in the region of the unusual growth; that an injury such as the one which had been suffered by the insured in this case would be more likely to produce pain than any other injury he sustained; that it would take less of an injury to disable him than a man with a normal back; that pain could be caused by a strain, and could be caused without an intervening accidental cause; that he was unable to tell from the x-rays the cause of the disability of the insured; that the condition described was definitely a congenital condition and had been there all the time; that if the vertebra and the ileum did not rub together there would be no pain; that an unusual blow on the top of a man's spine would cause the pain; that there was no way for the insured to know of the condition without an x-ray.

The insured testified that, several years before the application for the policy in this case was made, he had strained his back, and being a veteran of the World War he went to Base Hospital 48 for treatment; that his back was x-rayed, but that he was discharged without any treatment being given him, and that he was denied compensation for the alleged injury.

Under the evidence the jury was authorized to find that the answer to the question as to infirmity, deformity, etc., was not such a material misrepresentation as would avoid the policy. The facts of this case and those of *Commercial Casualty Co.* v. *Mathews,* 57 *Ga. App.* 446 (195 S. E. 887) are very similar, and what is said in that case has application in the case at bar.

■ Question 14 of the application was, "Have you been disabled by either accident or illness, or received any medical or surgical attention during the last ten years?" The insured answered "No." On the trial the insured testified in substance that he had had a previous back injury; that he had strained his back; that it caused him to stop work for a period of several months; that this occurred several years before; that he went to Hospital No. 48 for treatment, and applied for compensation on account of the injury; that he informed the hospital that he had been injured lifting a log; that it was two or three years before he fully recovered from this injury, and that he was off from work for two or three weeks;

that he suffered a partial disability for two or three years; that he did not know when this occurred and had no way to fix it in his mind; that it was six or seven or eight years ago; that when he went to the hospital no treatment was given him but that an x-ray was taken of him; that he went to this hospital because he was a veteran; that he was there about three hours.

We think the jury was authorized to find that the answer to this question was not such a material misrepresentation as to void the policy. Just when the accident happened was not brought ont clearly in the evidence. The burden of showing that the insured had been disabled by an accident within ten years from the date of the application was on the insurer; and the only evidence that there had ever been one was the testimony of the insured. He stated that he did not know when it was, that it was several years before, and that it might have been six or seven or eight years before. He testified that when it happened he went to the hospital and had his back x-rayed, and that he was discharged from the hospital within three hours and received no treatment and no compensation for the injury. See *Federal Life Insurance Co.* v. *Summergill,* 45 *Ga. App.* 829 (166 S. E. 54). Though he further testified that he was off from work for two or three weeks, and that he suffered a partial disability for a year or more, we think the jury was authorized to find that his complaint was a minor one which required no treatment, and was of such minor proportions as to make an inaccurate statement with reference thereto immaterial in the application for insurance, especially when the insured was not required to interpret what is meant by the term "disabled." In this policy the word is defined as being wholly incapacitated. See *Commercial Casualty Co.* v. *Mathews,* supra. Furthermore, under the evidence, the jury was not compelled to find that the previous disability from accident had occurred within ten years.

■ The third question presented is whether, under the terms of the policy, if the insured should be entitled to recover at all his recovery should be limited to $50. Paragraph A of the policy provides, "At the rate of $100 per month for the period, not exceeding two years, that bodily injuries effected during the life of this policy solely through external . . means shall . . disable and prevent the insured from performing each and every duty" etc. Paragraph E provides: "Sunstroke caused by the sun's rays, or hydro-

phobia, caused in each case by accidental means, shall be deemed a bodily injury effected through external, violent, and accidental means. Injuries, fatal or nonfatal, which do not produce immediate total or partial disability as is covered by paragraphs A or B hereof, or which do not produce a visible contusion, cut or wound on the exterior of the body (accidental drowning and asphyxiation excepted) or injuries, fatal or otherwise, loss or disability caused wholly or in part, directly or indirectly by disease not caused solely by a bodily injury covered hereunder shall be considered arising out of sickness or disease and are covered only under and subject to the illness provisions hereof."

The evidence demanded the finding that the disability of the insured arising because of the injury sustained was immediate. The evidence was to the effect that when the bale of cotton fell on him he lay on the ground for a while, that he was then put in a truck and carried to the doctor, and that from that time for a period of nine months he was disabled.

Other provisions of the policy were that for a non-confining illness the liability of the company would be limited to $50.

It is contended by the company that, since the evidence showed that there were no contusions on the body of the insured, and no outward signs on his body of the injury sustained, under the provisions of the policy the disablility would be construed to arise because of sickness, and not be paid for as an accident. We are unable to agree with this contention. It is true that there were no signs of the accident on the body of the insured, yet it does not follow that under the terms of the policy the disability arose because of sickness. Counsel for the plaintiff in error have misconstrued paragraph E of the policy. This paragraph does not say that in the absence of any cut or contusion the disability shall be deemed to arise because of illness, but says "injuries, fatal or nonfatal, *which do not produce immediate total or partial disability,* . . *or which do not produce a visible contusion,"* etc. An injury which produced *immediate total disability* would not be deemed disability arising because of sickness. Nor would disability arising where there was a visible contusion or cut. These two types of injuries are connected in the policy with the disjunctive *or.* An injury under either of the two classifications would be covered by provision A of the policy. If the policy intended to provide that every injury

which did not produce a visible contusion, wound, or cut should be considered an illness rather than an accident, it would have been meaningless and absurd to refer in the policy to an injury which produced immediate disability. The insurance company contends that in spite of immediate disability the outward evidence of injury is essential before the injury can be considered accidental. Then why the provision with reference to immediate disability? An injury which leaves a scar may be accidental even if it does not produce immediate disability. An injury which produces immediate disability may be accidental even if there is no scar. This meaning is clearly the intention of the policy. If ambiguous, such a construction must be given.

The next question presented is whether the policy had lapsed for non-payment of premiums. M. W. Childs testified that he took out a policy of insurance with the defendant; that the policy was sent to him by a Mr. Cooper; that Cooper delivered the policy to him, either in person or by mail; that at the time he got the policy he paid the sum of $9.20 which was to cover the monthly premium on the policy actually delivered and the monthly premium on another policy which he wanted; that he had an agreement with Cooper that if both policies were not delivered the second $4.60 would be credited to the policy actually delivered; that he had never gotten credit for this $4.60; that because he had never gotten credit for this $4.60, he went to the office of the company in Atlanta on September 23; that at the office he was informed by a Mr. Wright that nothing could be done about the credit, but that the insured would have to straighten it out with Cooper; that Wright told him that the policy required reinstatement, and that it would require three months premium to reinstate it; that he offered a check on a third person or a personal check, and Wright elected to take a personal check; that this check in the amount of $13.80, to cover three months premiums, was given Wright, the check being drawn on the Bank of Locust Grove and given on September 23, 1937; that this check had been paid; that he did not know how much money he had in the bank at the time the check was given; that he had a check for $40 in his pocket at the time; that he did not receive any notice from Wright on September 24 that the check had not been paid; that the first letter he got from them was in November; that he never received notice that

the check was not paid; the check shows that it was paid on September 29, 1937; that he does not know whether the check was paid when presented the first time; that the indorsement of the company was on the back of the check and on top of the September 24th indorsement of the Atlanta Clearing House; that the September 27 indorsement of the Atlanta Clearing House is on top of these two indorsements; that the check for the first $9.20 was paid with the understanding that if he did not get two policies the money would pay two months premiums; that the check for $9.20 is indorsed by the insurance company and he has never gotten credit for the $4.60 which he claims is due.

H. C. Childs testified that he was the cashier of the Bank of Locust Grove; that the insured carried an account at the bank at times; that the ledger sheet of the insured showed that he had made no deposits in the bank between September 15, 1937, and May 7, 1937; that on September 15, 1937, the balance of the insured was $110; that on September 23, 1937, the balance was $10; that on September 24 there was a deposit of $41.63 and a check for $40, leaving a balance of $11.63; that the account remained in that condition until September 27, 1937, when there was a deposit of $2.17, making a balance of $13.80; that there was a check for $13.80 paid by the bank on September 29; that the check could have been paid the day before and entered as being paid the 29th; that he does not know the circumstances of the handling of the check for $13.80; that when a check is turned down because of lack of funds to cover, the notation "Ins. f." is placed on the check in pencil; that at the time the check came in the insured had said nothing to him about any arrangements having been made to cover the check when it came to the bank; that the check was listed twice by the Atlanta Clearing House; that he does not know of his own knowledge why the check went through the clearing house twice; that it is not unusual in a small community to give the writer of a check, when there is an insufficient amount in the bank to cover it, an opportunity to cover the check; that this is done frequently; that when the check came into the bank the last time and was paid it had been indorsed by the insurance company, and that the indorsement of the company was placed over the indorsement of the clearing house; that it could have been that the check was turned down because of an improper or no indorsement, and not because

of a lack of funds; that he discussed the check with Mr. Wright, and he pointed out to Mr. Wright that there was no notation on the check that it had been turned down for lack of funds.

H. S. Daniel testified that he was the bookkeeper of the Bank of Locust Grove; that he remembered a check of the insured for $13.80 being turned down but he did not remember just why it was turned down; that the insured told him that if the check for $13.80 came in and there was not enough money to cover it to go to a Mr. Hubbard, a few doors below the bank, and get the money; that the insured had made arrangements for the payment of the check; *that he turned the check down through oversight for insufficient funds;* that he was under no obligation to go to Hubbard and get the money to cover the check, but that it was an accommodation he had shown the insured and other people on other occasions; that the arrangement to cover the check was made by all three of the parties, and the witness told the insured he would get the money if it did not slip his mind; that the insured acted in good faith when the check was given; that the same entry would be made on the books of the bank whether the check was turned down for insufficiency of funds or lack of proper indorsement; *that in view of the arrangement made by the insured to have the check covered it was reasonable to assume that the check had been returned for lack of proper indorsement.*

L. O. Wright testified that he was the underwriter and that he signed the policy in question; that on September 23 the insured came into his office and signed a reinstatement application and gave him a check for $13.80 on the Bank of Locust Grove; that this check was returned to the company with a notice attached thereto marked "insufficient funds" on September 27, or perhaps the notice was across the front; that the company deposited the check again, but he does not remember the date or the date the check was paid; that later the cashier of the Bank of Locust Grove came in and asked why the company had rejected the claim of the insured; that he told him the check was returned marked insufficient funds; that the cashier pulled the check out of his pocket and it showed that it had been paid; that he called attention to the fact that "insufficient funds" was written dimly across the face of the check; that the cashier put the check in his pocket, used some profanity, and walked out; that the indorsement of the company

was put on the check before the indorsement of the clearing house.

The check in question was exhibited to the jury and they were allowed to examine it with the aid of a magnifying glass. The receipt book of the insured was introduced showing payment of the July, August, and September premiums on September 23, 1937. There was introduced a letter from the company to the insured, dated November 21, 1937, directed to Marquis W. Childs, denying liability on the policy for the reason that the check given on September 23, 1937, was returned because of "insufficient funds."

Under this evidence the jury was authorized to find that the check had not been returned for the reason that there were not sufficient funds in the bank to pay it, but that it had been returned because the insurance company had not indorsed it before it was deposited, and that it was returned because of a lack of proper indorsement. It is unnecessary to decide whether the payment of the check would date from the time it was made, in view of the redeposit of the check by the company.

These are the only questions argued by the plaintiff in error in its brief. It is unnecessary to consider the assignments of error not argued, as they are deemed to be abandoned. The evidence amply supported the verdict, and the court did not err in overruling the motion for new trial.

*Judgment affirmed. Stephens, P. J., and Sutton, J., concur.*